IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ABRAHAM RAMEY, #160238, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:10-CV-1064-TMH |
| | ) | |
| CEDRICK SPECKS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by Abraham Ramey ["Ramey"], a state inmate and frequent litigant in this court, challenging actions taken against him in December of 2010 during his confinement at the Ventress Correctional Facility.  Ramey, a practitioner of Rastafarianism, complains that the defendants violated his First Amendment right to the free exercise of his religion by requiring him to cut his hair.  Specifically, Ramey maintains that he should be allowed to wear his hair in dread locks pursuant to the teachings and beliefs of his religion.  Ramey names Capt. Cedrick Specks, Sgt. MacMillian (later identified by the plaintiff as Sgt. McClain), Warden J. C. Giles, Assistant Warden Marshall Monk, Lt. Carolyn Longmire, Chaplain Steve Walker and Chaplain Daniel E. Rieben as defendants in this cause of action.  Ramey seeks a declaratory judgment, monetary damages and injunctive relief for the alleged violations of his constitutional rights.

The defendants filed an answer, special report and relevant supporting evidentiary materials addressing Ramey's claims for relief. The court informed Ramey that the defendants' special report may, at any time, be treated as a motion for summary judgment, and the court explained to Ramey the proper manner in which to respond to a motion for summary judgment. *Order of March 2, 2011 - Doc. No. 16*. Ramey responded to the special report filed by the defendants. *Doc. No. 17*. Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof and Ramey's response in opposition, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1] The party moving

---

[1] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes. Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Thus, although Rule 56 underwent stylistic changes, its substance remains the same and,

for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

---

therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

In civil actions filed by inmates, federal courts

must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal

citation omitted). Consequently, to survive the defendants' properly supported motion for

summary judgment, Ramey is required to produce "sufficient [favorable] evidence" which

would be admissible at trial supporting his claims of constitutional violations. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on

which the nonmoving party relies] is merely colorable . . . or is not significantly probative

. . . summary judgment may be granted." *Id*. at 249-50. "A mere 'scintilla' of evidence

supporting the opposing party's position will not suffice; there must be enough of a showing

that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477

U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573,

1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise

insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose

a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d

1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997)

(plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence,

are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th

Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond

"his own conclusory allegations" challenging actions of the defendants); *Fullman v.*

*Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory

allegations is not sufficient to oppose summary judgment . . . ."). Hence, when a plaintiff

fails to set forth specific facts supported by requisite evidence sufficient to establish the

existence of an element essential to his case and on which the plaintiff will bear the burden

of proof at trial, summary judgment is due to be granted in favor of the moving party.

*Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest*

*Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case

the plaintiff presents insufficient evidence to require submission of the case to the trier of

fact, granting of summary judgment is appropriate.).

For summary judgment purposes, only disputes involving material facts are relevant.

*United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami,*

*Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the

substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the*

*Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual

disputes that are material under the substantive law governing the case will preclude entry

of summary judgment."). "The mere existence of some factual dispute will not defeat

summary judgment unless that factual dispute is material to an issue affecting the outcome

of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003)

(citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing

summary judgment "must do more than simply show that there is some metaphysical doubt

as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the

evidence before the court which is admissible on its face or which can be reduced to

admissible form indicates there is no genuine dispute of material fact and the party moving

for summary judgment is entitled to it as a matter of law, summary judgment is proper.

*Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary

materials and affidavits before the court show no genuine dispute as to a requisite material

fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, nonmoving

party must produce evidence such that reasonable trier of fact could return a verdict in his

favor).

Although factual inferences must be viewed in a light most favorable to the

nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a

*pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine

dispute of material fact.  *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906

F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate

this court's disregard of elementary principles of production and proof in a civil case.  In this

case, Ramey fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

### III.  DISCUSSION

**A.  Suit Against the Defendants in Their Official Capacities - Absolute Immunity**

To the extent Ramey seeks to sue the defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities

are protected from suit for damages under the Eleventh Amendment); *Edwards v. Wallace Cmty. Coll.,* 49 F.3d 1517, 1524 (11th Cir. 1995) (damages are unavailable from state official sued in his official capacity).

## B.  Challenge to Grooming Policy[2]

1.  The First Amendment.  In December of 2010, Capt. Specks ordered Ramey "to get [his] hair cut."  *Complaint - Doc. No. 1* at 3-4.  Ramey advised that it was against his religious beliefs to cut his hair but Specks advised Ramey that he was still required to cut his hair.  *Id*. at 4.  Ramey complied with the order and received a haircut from an inmate barber. *Aff. of Facts in Response to Defendants' Report - Doc. No. 17* at 1.

Ramey practices Rastafarianism.  He asserts that allowing his hair to remain uncut and in dread locks is significant to the tenets of his religion.  The claim presented by Ramey challenges the constitutionality of the grooming policy adopted by the Alabama Department of Corrections.  Specifically, Ramey alleges the grooming policy violates his right to the free exercise of his religion under the First Amendment because it completely eliminates his ability "to wear [his] hair in a proper dread form."  *Complaint - Doc. No. 1* at 4.  The

---

[2] In his complaint, Ramey challenges the inmate grooming policy implemented by the Alabama Department of Corrections ["ADOC"] as violative of his right to the free exercise of his religion. Specifically, Ramey complains that, as a practitioner of the Rastafarian religion, the ADOC's grooming policy requiring that he cut his hair is contrary to his religious beliefs. The complaint further alleges that the grooming policy constitutes religious discrimination against inmates of the Rastafarian faith.  All of the claims presented in the complaint relate to the grooming policy.  To the extent Ramey attempts to raise a new theory of liability regarding the characterization of his religion as one of "solo study" in his response to the defendant's report, the court rejects that attempt. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff many not amend h[is] complaint through argument in a brief opposing summary judgment.").  Accordingly, the court's discussion is limited to addressing those claims specifically presented in the complaint.

defendants argue that requiring inmate adherence to the grooming policy does not result in a violation of the inmate's constitutional rights as the challenged policy advances the legitimate penological interests of promoting inmate health and hygiene and maintaining safety and security within the prison system.  *Defendants' Special Report - Doc. No. 14* at 7-8; *Defendants' Exh. 7 (Inmate Grooming Policy)* at 2; *Defendants' Exh. 8 (Aff. of Associate Commissioner Terrance McDonnell) - Doc. No. 14-8* at 1-3.

Commissioner McDonnell explains the grooming policy and its purpose as follows:

> ADOC has a policy that inmates' hair must be worn in a style that promotes health, identification, and that meets security needs.  Listed below are the specific . . . reasons . . . as to why dread-lock hair styles are not allowed:
>
> Health
> Dread-locks are formed by twisting one's hair into tightly woven portions of hair.  After it has been tightly twisted, the hair begins to lock-up on its own.  Dread-locks are not unwoven for this reason.  This tightly twisted hair is difficult to keep clean and free of head lice, bacteria, and other contaminants.  Once head lice are established in an institution it becomes a health risk to other inmates and the officers and is difficult to eradicate.
> Identification
> Identification is very important to controlling security within an institution, identifying individuals at the request of other agencies as being a suspect, and to identifying inmates that have escaped.  By allowing hair styles such as dread-locks and long hair, an inmate would be able to drastically change his appearance by simply cutting his hair.  For the same reason, ADOC does not allow inmates to change their hair color.
> Identification is also very important in another area.  Hair styles such as dread-locks are easily recognized by other inmates who have an opposing attitude toward that hairstyle caused by religious reasons, gang activity, or other reasons.  Such hair styles would lead to more conflicts between inmates inside the institution.
> Security
> Hair styles that make it easier for [an] inmate to hide contraband, such as drugs, weapons, escape devices, etc., inside the dread-locks are a serious

security risk.  The control of contraband within an institution is a never ending battle and is a major concern of ADOC.  Obviously maintaining security is also affected by inmate identification and the spread of contaminants within an institution.

Negative Impact

There would [be] a definite negative impact upon ADOC if dread-locks were allowed.  If an inmate's hair is unclean, odoriferous, [or] unsightly, other inmates being housed in the same unit as [the dread-locked] inmate are certainly going to react to that inmate in a negative way....

If that hair style causes more unrest among the inmates, fights and/or violence, that is certainly a negative impact on the officers charged with maintaining control of the inmates within the institution....

If an escaped inmate can drastically change his physical appearance by simply eliminating his hair style, then ADOC would have a more difficult task, have to use more man-power, and have to utilize more resources in apprehending that escapee, which is absolutely a negative impact.  This example not only would affect ADOC but would certainly negatively impact the general public being subjected to an escapee on the loose.  Additionally if an inmate can drastically alter his appearance, he could easily avoid identification concerning other committed and not convicted crimes.

*Defendants' Exh. 8 (Aff. of Associate Commissioner Terrance McDonnell) - Doc. No. 14-8*

at 1-3.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)].  As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.'  *Id.*, at 404-405, 94 S.Ct., at 1807.  Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources . . . ."  *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).  Correctional officials are, therefore, "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S.

319, 321 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of

many [inmate] privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quotation

marks and citation omitted); *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). The principle

limiting the constitutional rights retained by inmates "applies equally to pretrial detainees and

convicted prisoners. A detainee simply does not possess the full range of freedoms of an

unincarcerated individual." *Id*., at 546.

"In the First Amendment context, . . . some rights are simply inconsistent with the

status of a prisoner or 'with the legitimate penological objectives of the corrections system.'"

*Shaw v. Murphy*, 532 U.S. 223, 229 (2001), quoting *Pell*, 417 U.S. at 822. In accordance

with this principle, an inmate's rights established under the First Amendment are not

protected if allowing such protection is "inconsistent with his status as a prisoner or with the

legitimate penological objectives of the corrections system." *Id*. at 822. Thus, while inmates

retain a constitutional right protected by the First Amendment to freely exercise their

sincerely held religious beliefs, this right is limited by the fact of incarceration and valid

penological objectives such as maintaining institutional security and order. *O'Lone v. Estate

of Shabazz,* 482 U.S. 342, 345 (1987); *Turner,* 482 U.S. 78; *Lawson v. Singletary*, 85 F.3d

502, 521 (11th Cir. 1996). The law is well settled that "central to all other corrections goals

is the institutional consideration of internal security within the corrections facilities

themselves." *Pell*, 417 U.S. at 823; *Bell,* 441 U.S. at 546 ("[M]aintaining institutional

security and preserving internal order and discipline are essential goals that may require

11

limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). It is, therefore, clear that preservation of security and order within a prison is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest. *Pell*, 417 U.S. at 823, *Lawson*, 85 F.3d at 512; *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

In a prison setting, to demonstrate a free exercise violation, a plaintiff must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which burdens the practice of his religion or restricts his free exercise of a sincerely held religious belief. *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden must be substantial and significantly interfere with an inmate's practice of his religious beliefs. *Hernandez*, 490 U.S. at 699. A policy is "valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone*, 482 U.S. at 349. "[S]uch a standard is necessary if 'prison administrators . . . , and not the courts [are] to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 89 (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539 (1977)). Consequently, the defendant does not have the burden of proving the validity of a regulation; rather, the burden is on the plaintiff to disprove it. *Id*. at 89-91.

In determining whether a prison regulation improperly infringes on a prisoner's

constitutional rights, the factors to be considered include: (1) whether there is a valid, rational relationship between the regulation and the legitimate government interest it serves; (2) whether there are alternative means of exercising the right available to the inmates; (3) the impact accommodation of the asserted right will have on jail staff and other inmates; and (4) the absence of ready alternatives as evidence of reasonableness of the regulation. *Turner*, 482 U.S. at 89-91; *Beard*, 548 U.S. at 529, 126 S.Ct. at 2578. However, a "court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Freeman v. Texas Dep't of Criminal Justice,* 369 F.3d 854, 860 (5th Cir. 2004) (interpreting the decision in *Turner* as stating that a court need not weigh evenly or even consider each of the factors as rationality is the controlling standard).

The stated purpose of the prison system's hair length policy is to maintain safety and security in each correctional facility and provide a clean and healthy environment. *Defendants' Exh. 7 (Inmate Grooming Policy)* at 2. Ramey does not dispute the policy's purpose. Correctional grooming policies have repeatedly been upheld by federal courts, including the Eleventh Circuit Court of Appeals, in the face of challenges under the Free Exercise Clause of the First Amendment as reasonably related to legitimate penological interests in maintaining security and promoting cleanliness. *Harris*, 97 F.3d at 504 (The Court acknowledged "a compelling State interest in issues relating to the security of prison facilities and related issues, such as the ability to identify prisoners, to be able to prevent

13

[prisoners] from disguising themselves and from secreting objects in their hair and so forth[,]" and, therefore, upheld a prison hair length regulation under the First Amendment and more rigorous least restrictive means standard as correctional officials "have a compelling interest in security and order" and the regulation constituted "least restrictive means" of satisfying these interests); *Martinelli v. Dugger*, 817 F.2d 1499, 1506-1507 (11th Cir. 1987), *abrogated on other grounds by Harris*, 97 F.3d 499 (prison hair length rule virtually identical to rule addressed in *Harris* upheld as constitutional because rule was least restrictive means of advancing substantial government interests in maintaining prison security and identifying escapees); *Shabazz v. Barnauskus*, 790 F.2d 1536, 1540 (11th Cir. 1986) (affirming decision of district court that regulation prohibiting beards on inmates "serve[s] a legitimate penological interest in preventing escape" and constitutes the least restrictive alternative available); *Longoria v. Dretke*, 507 F.3d 898, 901 (5th Cir. 2007) (grooming policy which prohibited male inmates from growing long hair not violative of the Free Exercise Clause); *Green v. Polunsky*, 229 F.3d 486 (5th Cir. 2000) (prison grooming policy requiring inmates to keep their hair cut short and faces clean shaven reasonably related to legitimate penological interests and, therefore, did not deprive inmate free expression of religion under the First Amendment); *Powell v. Estelle*, 959 F.2d 22, 26 (5th Cir. 1992), *superceded by statute as stated in Diaz v. Collins*, 114 F.3d 69 (5th Cir. 1997) (correctional facility's prohibition on long hair valid as policy "is rationally related to legitimate state objectives."); *Hines v. South Carolina Dep't of Corr.*, 148 F.3d 353, 358 (4th Cir. 1998)

14

(grooming policy "enacted to suppress contraband, limit gang activity, maintain discipline and security, and prevent inmates from quickly changing their appearance" did not run afoul of the Free Exercise Clause of the First Amendment as policy was based on "legitimate - indeed, compelling - governmental and penological interests" of maintaining order, discipline and safety); *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996) (hair length regulation did not violate Native American prisoner's constitutionally guaranteed right to free exercise of religion); *Campbell v. Purkett*, 957 F.2d 535, 537 (8th Cir. 1992) (finding prison hair length rule applicable to follower of Nazarite religion constitutional); *Iron Eyes v. Henry*, 907 F.2d 810, 814-16 (8th Cir. 1990) (prison regulation prohibiting hair longer than base of shirt collar did not run afoul of the Free Exercise Clause as regulation was reasonably related to legitimate penological interests); *Henderson v. Terhune*, 379 F.3d 709, 715 (9th Cir. 2004) (prison regulation prohibiting hair longer than three inches did not unconstitutionally restrict inmate's right to free exercise of Native American religion as the "hair length regulation is reasonably related to legitimate penological interests[]" including maintaining security in the prison and promoting prisoner hygiene); *Hall v. Bellmon*, 935 F.2d 1106, 1114 (10th Cir. 1991) (prison intake policy of cutting inmates' hair does not violate free exercise of religion as policy relates to legitimate penological interest of preventing inmates from hiding weapons in their hair); *Thunderhorse v. Pierce*, 418 F. Supp. 2d 875, 895 (E.D. Tex. 2006) (prison regulation governing hair length did not violate Native American inmate's free exercise rights); *Gooden v. Crain*, 389 F. Supp. 2d 722, 725 (E. D. Tex. 2005) ("[A]ny challenge to

15

the prison system's grooming policy based on the Free Exercise Clause is frivolous."); *Diaz v. Collins*, 872 F. Supp. 353, 358-359 (E.D. Tex. 1994) (security concerns constitute compelling governmental interests in requiring inmates to cut their hair and grooming regulation is least restrictive means to achieve these interests); *Phipps v. Parker*, 879 F. Supp. 734, 736 (W.D. Ky. 1995) (prison hair length rule did not violate First Amendment rights of Orthodox Hasidic Jew because rule advanced compelling government interests in maintaining prison safety, providing quick identification of inmates and promoting sanitation and satisfied requirement for implementation of least restrictive means).

Although Ramey's complaint does not allege a violation of the Religious Land Use and Institutionalized Persons Act of 2000 ["RLUIPA"], 42 U.S.C. §§ 2000cc, *et seq.*, even if it did Ramey would not be entitled relief.  The relevant portion of RLUIPA provides that: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2).  In evaluating RLUIPA, the Supreme Court has determined that prison security, as well as the need to maintain health, safety and order, are compelling government interests which may justify actions that restrict religious practices. *Cutter v. Wilkinson*, 544 U.S. 709, 125 S.Ct. 2113, 2123 (2005).  Additionally, the Court directed that RLUIPA must "be applied in an appropriately balanced way, with particular sensitivity to security concerns." *Id*.  In *Limbaugh v. Thompson*, Civil Action No. 2:93-CV-1404-WHA-CSC, a case filed by

Native American inmates which included among its numerous claims a challenge to the

ADOC's policy restricting hair length, this court determined that such policy did not violate

RLUIPA. *Limbaugh - Doc. No. 549 (Order Adopting Recommendation of the Magistrate

Judge)* at 3 ("[T[he Alabama Department of Corrections' regulations restricting inmate hair

length do not violate the Religious Land Use and Institutionalized Persons Act of 2000, 42

U.S.C. § 2000cc, *et seq*."). "If a prison regulation passes muster under RLUIPA . . . it will

perforce satisfy the requirements of the First Amendment, since RLUIPA offers greater

protection to religious exercise than the First Amendment offers." *Smith v. Allen*, 502 F.3d

1255, 1264 n.5 (11th Cir. 2007).

For the foregoing reasons, the court concludes that the ADOC's hair length policy is

not violative of either RLUIPA or Ramey's First Amendment rights.   Consequently, the

defendants are entitled to summary judgment on Ramey's challenges to the constitutionality

of the grooming policy adopted by the ADOC.

2.  Equal Protection Challenge.  Ramey appears to allege that inmates who practice

Rastafarianism should be afforded the same protection from enforcement of the hair length

policy as inmates of other religions. *Complaint - Doc. No. 1* at 4.  The court construes this

allegation as an equal protection challenge. This claim, however, entitles Ramey to no relief.

In order to establish a claim cognizable under the Equal Protection Clause, "a prisoner

must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who

received more favorable treatment; and (2) the state engaged in invidious discrimination

against him based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318-19 (11th Cir. 2006). Additionally, to succeed on an equal protection challenge, the plaintiff must also demonstrate the existence of discriminatory intent; arbitrary application of prison regulations without discriminatory intent is insufficient to demonstrate a violation of the Equal Protection Clause. *Jones v. White*, 992 F.2d 1548, 1573 (11th Cir. 1993); *E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987). "[O]fficial action will not be held unconstitutional solely because it results in a . . . disproportionate impact . . . . Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991). In a case such as this one, where the plaintiff challenges actions of prison officials, exceptionally clear proof of discrimination is required. *Fuller v. Georgia Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988). Evidence which merely indicates disparity of treatment is insufficient to show discriminatory intent. *McKleskey v. Kemp*, 481

U.S. 279 (1987).

Since this case is before the court on a properly supported motion for summary judgment from the defendants, Ramey bears the burden of producing some evidence to show that the actions of the defendants resulted from intentional discrimination. *Celotex*, 477 U.S. at 322-24; *Waddell*, 276 F.3d at 1279. Ramey utterly and completely fails to meet this burden as he has offered no evidence identifying any other similarly situated inmate exempted from the hair length policy based on religious beliefs. *See Brunskill v. Boyd*, 141 F. App'x 771, 776 (11th Cir. 2005). Instead, the records before this court demonstrate and the plaintiff does not dispute that correctional officials apply the policy to all inmates regardless of their religious affiliation. Furthermore, Ramey does not allege and the record is devoid of evidence that the defendants subjected him to a hair cut based on some constitutionally impermissible reason; rather, it is undisputed that the defendants based their decision requiring Ramey to cut his hair on health, hygiene, safety and security concerns. In light of the foregoing, summary judgment is due to be granted in favor of the defendants on Ramey's equal protection claim.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be granted;

2.  Judgment be granted in favor of the defendants;

3.  This case be dismissed with prejudice; and

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that the parties are DIRECTED to file any objections to the Recommendation **on or before June 7, 2013**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Sec., Inc*., 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 24th day of May, 2013.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE